Arnold Guy Fraiman, J.
In this taxpayer’s suit for a declaratory judgment and related relief, plaintiffs have moved for summary judgment, and defendants have cross-moved to dismiss the complaint on the ground that plaintiffs lack standing to sue, or in the alternative, for a declaratory judgment in their favor. Plaintiffs are the New York Public Interest Research Group, Inc., and Messrs. Lazarus, Tupper, Hanford and Golden. All are taxpayers who own real estate in New York City with an assessed valuation in excess of $1,000. Defendants are the unions representing the uniformed service officers and employees of the city, and the Mayor, the Comptroller and the city itself.
At issue is the legality of contributions made by the city to certain so-called “annuity funds” maintained by the defendant unions for the benefit of all uniformed employees of the police, fire, sanitation and correction departments. These funds were established in 1967 and 1968 pursuant to agreements entered into by the city with the defendant unions following collective bargaining negotiations for those years. Plaintiffs contend that they are illegal because they constitute the creation of a retirement system by the city and therefore contravene subdivision a of section 113 of the Retirement and Social Security Law, which provides that "[n]o municipality, after April *264 twelfth, nineteen hundred twenty-two, shall create any retirement system for its officers or employees.” Defendants deny that the annuity funds are a retirement system and challenge plaintiffs’ standing to sue. The latter contention may be quickly disposed of. Plaintiffs sue as taxpayers pursuant to section 51 of the General Municipal Law which permits taxpayers owning taxable realty with an assessed valuation of $1,000 to commence an action against officers of a municipality to prevent illegal official acts on their part or to prevent waste. Clearly, if plaintiffs’ claim is legally correct, then the creation of the annuity funds herein were illegal official acts by the Mayor and Comptroller, since they were in contravention of subdivision a of section 113. Moreover, any payments made thereunder, since made in violation of law, would also constitute waste. Defendants’ argument that no waste is involved, because "if such payments are terminated, employees in the City’s uniformed forces will seek equivalent employment benefits in the form of increases in their cash wages, or in the form of some other fringe benefit or benefits” is specious at best. While defendants may seek equivalent benefits, there is obviously no assurance that they would be forthcoming, particularly in this period of grave fiscal crisis faced by the city.
We turn now to the substantive issue raised by the motion and cross motions. Although there are minor variations in the terms of the agreements entered into between the city and the individual unions insofar as the funds are concerned, basically they are the same. They provide that the city will contribute to a trust fund established by each of the unions a specified sum for each day of active employment by employees in the titles covered by the agreements. The sums range from $1 to $2.65, depending upon the rank and grade of the employee. The trust funds, which are referred to in the agreements as "annuity funds”, are administered exclusively by trustees designated by the unions, but they are subject to audit by the Comptroller, and the trustees are required to file annual reports with him. The employees do not contribute to the funds.
The payments made by the city on behalf of each covered employee vest in the employee immediately. Upon the termination of his employment, regardless of its duration, and whether by retirement, resignation, dismissal, death, or in some instances, by promotion, the employee is entitled to *265 receive the accumulated payments made in his behalf, plus a proportionate share, if any, of the fund’s net investment yield. In most instances, the annuity benefit payment is made in a lump sum, although some of the funds provide alternatively for monthly installments over an extended period. As in the case of pension benefits, the payments are taxable as ordinary income when received by the employee.
The first fund was established following contract negotiations between the city and the Uniformed Sanitationmen’s Association in 1966. The fund was conceived as an alternative to an across-the-board wage increase. While its immediate obligations would be the same in both instances, by availing itself of the so-called "annuity fund” device, the city avoided raising the annual base salaries of the employees, on which their regular retirement system pensions are calculated. The other defendant unions were offered the same device by the city in its negotiations with them following the sanitation-men’s agreement. Thereafter, the funds were periodically continued in subsequent collective bargaining agreements with each of the defendant unions.
It is apparent from the foregoing that the annuity funds herein bear certain resemblances to a retirement system. Both are systems of deferred compensation. In both, payments vest in the employee when made by the city to the pension fund or annuity. And in both, the payments, although vested when made, are not taxable as income to the employee until actually received by him, pursuant to rulings of the Internal Revenue Service. Despite these similarities, however, there is a significant distinction between the funds created here and those created in a retirement system which mandates the conclusion that the Legislature in enacting subdivision a of section 113 did not intend to prohibit the deferred payment plans here involved. That distinction is that under the instant fund agreements, the city’s obligation is fixed and certain: it is required to contribute a specified sum for each day of active employment of covered employees. That is the full extent of its obligations. Its monetary commitment is exactly the same as if the payments were made in the form of wages, the only difference being, as noted, that by using the deferred payment device, the base wage of the employee is not raised. On the other hand, the city’s obligations under its regular retirement systems are neither fixed nor certain. They are dependent upon a variety of unknown factors: the highest salary *266 achieved by the employee during his active employment; the duration of his employment; and the number of years he survives after retirement.
It is the presence in a retirement system of these variables, which are impossible to calculate with any precision, that led to the enactment of subdivision a of section 113. That section was drafted by a Commission on Pensions, established by the State Legislature in 1918. In a report dated March 30, 1921, the commission, after studying the myriad and haphazard pension systems in effect in cities and municipalities throughout the State, made the following observations: "The Commission believes that unless the State takes an active part in the establishment of a reasonable and sound policy for the retirement of employees in the cities and rural districts, pension legislation will continue to be largely sponsored by interested groups of employees who will seek benefits without adequate consideration of their cost.” (Second Report of the Commission on Pensions, NY Legis Doc, 1921, No. 66, p 23.) As a solution to the problem, the pension commission proposed that the State create a public employees retirement system, and this was done in 1922 by amending the Civil Service Law of 1909 (L 1922, ch 591). Under the new law, existing local pension systems were not abolished, but municipalities were permitted to join the State system. However, under section 80 of the Civil Service Law of 1909, which is now subdivision a of section 113 of the Retirement and Social Security Law, no new local retirement system could be established after the creation of the State system.
Thus, the legislative intent in enacting subdivision a of section 113 was to halt the proliferation of local retirement systems whose indeterminate costs would only be felt in the future. That problem is not present here. As noted, the city’s commitment ends with its contributions to the annuity funds. And it ultimately controls even those payments by determining the number of covered employees it has on its payroll. Wage increases, years in service, and mortality rate after retirement, on the other hand, play no role in its fixed obligation. Accordingly, no justifiable purpose would be served by including the instant funds within the ban of subdivision a of section 113.
Nor does the opinion of the Court of Appeals in Board of Educ. v Associated Teachers of Huntington (30 NY2d 122) relied upon by both sides, require such a result. That case, *267 which is the only decision interpreting subdivision a of section 113, is inapposite so far as the issue at bar is concerned. There, the School Board of the Town of Huntington entered into a collective bargaining agreement with the local teachers’ union which contained a provision that each teacher who indicated an intention to retire one year prior to his retirement was to receive at the start of the last school year of service a salary increase equal to five tenths of one percent of his current salary multiplied by his number of years of service. Subsequently, the board questioned its own power to bind itself to this and several other provisions of the same collective bargaining agreement, and commenced an action seeking a judgment declaring the provisions illegal. After determining that the so-called retirement award provision involved a term and condition of employment, and was therefore an appropriate subject for collective bargaining under the Taylor Law (Civil Service Law, art 14), the court concluded (p 128) that it did not contravene subdivision a of section 113: "Nor may the provision be regarded as creating a retirement plan since the additional compensation was made payable only upon completion of the required services during the year prior to retirement. If this were to be deemed a retirement benefit, then, it would be equally logical to argue that increases in compensation in the years immediately prior to retirement were part and parcel of the retirement plan.” Basis for the court’s holding, then, was that the payments were made during the teachers’ employment. Plaintiffs argue that by so holding the court implied that if the payments were deferred until after retirement they would have been void under subdivision a of section 113. They then contend that since the instant payments are in fact deferred until after termination of employment, they should also be declared illegal. While plaintiffs’ premise that if the payments in Huntington had been deferred until after retirement, the court would have voided them, may be correct, it does not follow that the instant payments are also invalid. The payments in the Huntington case were affected by two variables: the employee’s salary in the year before his retirement and the duration of his employment— typical characteristics of retirement system payments. But, as previously noted, the payments herein are fixed and certain, and the Huntington decision is therefore not applicable.
One further obvious feature of the annuity fund agreements *268 before the court compels the conclusion that they are merely deferred compensation agreements, or termination payments, and not retirement payments: each of the annuity funds provides for payment of benefits to the employee upon his termination from service for any reason whatever, and regardless of the duration of his service. On the other hand, a principal characteristic of the city’s retirement systems is that benefits are payable only upon retirement after a designated minimum period of service. And although the benefits increase correspondingly upon service beyond the minimum period, they are forfeited if employment is terminated by reasons other than retirement. Thus the purpose of retirement system payments — to provide an incentive to an employee to faithfully perform his duties over an extended period, is unrelated to the reason the annuity funds were created. While payments thereunder have an incidental tax advantage to the employee over similar payments made in the form of wages, the sole purpose of creating the funds was to provide an additional monetary benefit to covered employees without increasing their base salaries. They were the result of apparently arduous, arm’s length collective bargaining negotiations between the city and the defendant unions, and all parties to the negotiations now seek to uphold their validity. Under such circumstances, in the absence of a showing that they are clearly in contravention of subdivision a of section 113, the court will not invalidate them.
For all the foregoing reasons, plaintiffs’ motion for summary judgment is denied and defendants’ cross motions are granted.